**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

**ELIZABETH HOUSTON**                                                **PLAINTIFF**

**v.**                                          **CIVIL ACTION NO.: 4:25-cv-32-JMV**

**MAJESTIC MISSISSIPPI, LLC**
**d/b/a FITZGERALDS CASINO-TUNICA**                                  **DEFENDANT**

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

This matter is before the court on Defendant Majestic Mississippi, LLC's motion for summary judgment on Plaintiff's complaint alleging a racially discriminatory termination of employment in violation of Title VII and 42 U.S.C. § 1981. [Doc. 25]. For the reasons below, the motion is granted.

**Background and EEOC Charge**

Plaintiff is a 57-year-old black female who worked as a Surveillance Lead and later the night shift Surveillance Supervisor starting in 2016 at Defendant's casino located in Robinsonville, Mississippi. [Doc. 1]. On February 13, 2024, Plaintiff was terminated by Defendant. On April 25, 2024, Plaintiff filed a sworn charge with the U.S. Equal Employment Opportunity Commission ("EEOC"). [Doc. 1] – Exh. A. Plaintiff identified race as the basis of discrimination in her charge, alleging discrimination occurred between November 16, 2023, and February 13, 2024. *Id.*

Plaintiff stated, in its entirety, in her charge:

> I am a 57-year-old black female resident of Coahoma County and Lyon, Mississippi. I was hired on October 27, 2016, at a store in Robinsonville, as a Surveillance Lead at Majestic Mississippi, LLC (MM).
>
> In August 2021, I was promoted to the position of Surveillance Supervisor.
>
> On July 14, 2023, Senior Agent Scarlett Hill (white female) returned to work from FMLA leave. She worked as a subordinate under me.

On or around November 16, 2023, Director of Surveillance Marvin Greenleaf (black male) directed me to meet with him in Human Resources.

I went to Human Resources and met with Mr. Greenleaf and Human Resources Manager Karen Baker (white female). During that meeting, Ms. Baker stated that MS. Hill had complained that I had "talked down" to Ms. Hill in a condescending manner. I denied this allegation and responded that Ms. Hill simply did not like following directions. To clarify, Ms. Hill had addressed a task that I had previously assigned her (Ms. Hill). I firmly but politely stated that Ms. Hill was capable of preforming the task and that the issue had already been addressed. I understood that Ms. Hill was not content with this response, yet I contend that dealing with disgruntled employees is a common experience for anyone in a position of leadership.

Nevertheless, Mr. Greenleaf and Ms. Baker instructed me to "correct [my] tone."

After that, between late November 2023 and early February 2024, Ms. Hill interacted with me in a confrontational and insubordinate manner.

Also during that time, Ms. Hill apparently made further subjective complaints to Ms. Baker about my allegedly condescending manner.

On February 13, 2024, Ms. Baker called me Human Resources. At that time, Ms. Baker informed me that I was terminated, allegedly because I was "failing to direct" and "not doing [my] job". Ms. Baker informed me that she made this decision following discussion between herself and General Manager Tony Scudiero (white male). I deny these vague allegations and contend that I consistently and faithfully performed the duties of my job.

After I was terminated, I filed for unemployment benefits with the Mississippi Department of Employment Security (MDES). Initially, I was denied benefits because MM stated to MDES that I failed to direct in my job. I subsequently appealed the decision.

On April 18, 2024, an appeal hearing was held, at which time MM elected not to participate. I contend this decision was due to the fact MM knew they lacked any supportive evidence to prove that I had failed to perform my job. As a result, MDES reversed the decision, and I was awarded unemployment benefits.

> After I was terminated, I learned that my position was replaced by a less experienced white female, Vickie Stephens.
>
> I have been discriminated against due to race, in violation of Title VII.

*Id.*

Of note, the EEOC charge does not reference any racially derogatory remark at all, and the only action that Plaintiff complains of as racially discriminatory was that she was replaced by a less qualified white female after another white subordinate female, Ms. Hill, complained repeatedly that Plaintiff was condescending to her.

In response to the EEOC charge, Defendant, as justification for its decision to terminate Plaintiff, provided multiple written complaints from black and white employees who worked under or with Plaintiff about her asserted mistreatment of them. As discussed below in more detail, none of the complaints make any reference to Plaintiff's or anyone else's race, or, much less, reference racially derogatory remarks or behavior. *See* multiple employee complaints at [Doc. 27] – Exh. 3; *see also*, excerpts of the complaints discussed *infra* pp. 6-8.

## **The Lawsuit**

On March 8, 2025, Plaintiff, represented by counsel, filed the instant lawsuit. [Doc. 1]. Like her EEOC Charge, the complaint made no allegation that Hill, (referenced above), or any other employee for that matter, made any racial or racially derogatory statement(s) to her or of which she was aware. Instead, the complaint, like the charge, alleges only that her white subordinate employee, Hill, complained to HR about Plaintiff's condescending manner, and that on February 13, 2024, Plaintiff was ultimately summoned to HR and terminated. Plaintiff alleges in her complaint that Hill "simply did not like following directions," and, as in her EEOC charge, she alleges she was replaced by a less qualified white female, V. Stephens. [Doc. 1] at 2, 4.

Unlike in her EEOC Charge, in her lawsuit, Plaintiff does acknowledge the various employee complaints produced by Defendant and relied on by it to support her termination, but she alleges only that these employees were all "frustrated with [her] expectations that her subordinates meet their goals and perform their job duties at a high level of proficiency." [Doc. 1] at 4. She asserts she "frequently had to manage the protest of disgruntled employees, and it is common that those employees project their frustrations on to their supervisor rather than owning up to their own job performance deficiencies." *Id*. at 5.

Of note, the sworn complaint makes no mention of any racial comment or racially derogatory remarks made by anyone. In fact, the complaint, like the sworn EEOC charge, only references race in order to identify the race of certain employees: her boss, Director of Surveillance Marvin Greenleaf as a black male (who it is uncontested made the decision to terminate her)[1]; Ms. Hill, a white subordinate who complained that Plaintiff was condescending to her, Ms. Stephens who she alleges was a less qualified white person who replaced her, HR Manager Karen Baker and General Manager Tony Scudiero, both white, who were consulted regarding her termination. Moreover, while she acknowledges the complaints about her behavior received by HR from other employees in addition to Hill, she does *not* acknowledge the fact that a number of the complaints were from or concerned her treatment of *black* subordinates (as well as white ones). *See* excerpts, *infra* p. 6-8.

On November 18, 2025, Plaintiff's deposition was taken. On November 14, 2025, discovery closed. [Doc. 14].

---

[1] Defendant's HR Manager Affidavit [Doc. 27] at Exh. 1 – ¶12 ("Mr. Greenleaf made the decision to terminate plaintiff…"); *see also* Plaintiff's brief, [Doc. 35] at 12 (to same effect).

**The Motion for Summary Judgment**

On December 15, 2025, Defendant moved for summary judgment asserting in support that in as much as Plaintiff had asserted no direct evidence of racial discrimination, she must establish a *prima facia* case of race discrimination by offering proof of each of the following four factors: (1) she is a member of a protected class; (2) qualified for the position; (3) suffered an adverse employment action; and (4) was replaced by someone outside of the protected class, or that others outside of the protected group and similarly situated (i.e. comparators) were treated more favorably (hereinafter the "*McDonnell Douglas* factors"). *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, (1973); *see also Okoye v. University of Texas Houston Health Science Center*, 245 F.3d 507, 512-13 (5th Cir. 2001).

While Defendant does not challenge Plaintiff's ability to establish the first three factors, it asserts that Plaintiff cannot establish the fourth factor as she was incontestably not replaced with a person of a different race[2] nor has she alleged comparator status with anyone of a different race. Defendant also argues that even if Plaintiff could satisfy the *McDonnell Douglas* factors, it is entitled to summary judgment as it demonstrated by the multiple written complaints from black and white subordinates alike that it had a legitimate, non-discriminatory reason to terminate her— belittling and mistreatment of subordinates of all races.

Excerpts from the multiple written complaints on which Defendant relies are discussed below. First, are the statements of Mairo Brown, a black subordinate employee of Plaintiff. Brown authored at least two (2) statements about Plaintiff's mistreatment of her subordinates, the latter of which was handwritten and dated October 31, 2023. In it, Brown complained to HR that:

---

[2] While in her EEOC charge and complaint Plaintiff alleges that she was replaced by a white woman, Ms. V. Stephens, in her brief she now concedes that she was not replaced. [Doc. 35] at 8. It is not disputed that there were no qualified applicants to fill the position *See*, Affidavit of Defendant's HR Director [Doc. 27] - Exh. 1.

Elizabeth Houston is the worst supervisor I have ever had the displeasure to work with She's a very rude disrespectful Bully because of her title. She is the sole reason of my departure from this company but I'm not the first. She needs to be held accountable for her distasteful actions as a member of management. She has stated that she's very competitive and she's not going to let day or swing shift out do her. (with write ups Etc…) So I need to find her something and write it up. I've witnessed a lot of pettiness and wrong got done by her until I just can't deal with her at all.

The morale in this department has dropped immensely and its starting to show with the call outs and more. This is my official statement.

[Doc. 27] – Exh. 3 at 62.

Statement of Tomeko Robuck (spelling unclear), another black subordinate employee of Plaintiff, dated November 8, 2023. She wrote:

…On several occasions I have heard Supervisor Elizabeth Houston create a hostile work environment for others working the surveillance room by speaking aggressively…If a dayshift supervisor [Houston was the nightshift supervisor] has 7 write- ups, she has to have 9 writeups. She abuses her title as a supervisor…She addresses a person as "Girl, you hear me talking to you girl? Do what I tell you to do." Where is the respect here? We should all be a team…. If this situation was handled before now the turnover wouldn't be so high in surveillance. Every agent who was hired left because of the hostile work environment. Mario Brown [a black subordinate employee referenced above] was picked on every day…On several occasions I have had to calm down another agent who was having a panic attack because of the things that were going on in the surveillance room …This has to change.

[Doc. 27] – Exh. 3 at 65.

Roebuck also alleged that Candice Hudson, another black employee, was picked on every day until she quit. *Id*. at 66.

Similarly, a statement by the Manager of HR, Karen Baker, white, dated November 9, 2023, memorialized having spoken via phone to another employee, Vickie Stephens, white, regarding Plaintiff. It reads:

> Her statement to me was that [Plaintiff] Liz's behavior is hostile. She has witnessed several occasions where she was demeaning towards her staff to the point that they no longer want to work with her. Vickie also replied this included her. Ms. Houston is very harsh with her words and remarks. On one occasion, Vickie was working on a report and Ms. Houston told her she was not doing that right and she was not going to send that report. Vickie was very distressed with her tone and demeanor. She was brought to tears and contemplated resigning as a result.

[Doc. 27] – Exh. 3 at 63.

Joesph Guy, a white day shift supervisor, wrote on November 9, 2023, in part, about Plaintiff: "The unpredictability has made it where I dread having to work overtime with her." [Doc. 27] – Exh. 3 at 67.

Scarlet Hill, the white subordinate employee to whom Plaintiff made reference in her EEOC charge and complaint, wrote to HR on February 8, 2024, stating, in part: "If I ask her anything and am lucky enough to get an answer she answers in a way that makes me feel stupid for not knowing. … Now, I am always at the mercy of her moods. She is rude and condescending. I am afraid to come to work on the nights that we are alone together. I am scared she is going to be nasty to me … I have been here twenty-three years and have never had this kind of trouble with a supervisor and I have had many supervisors.…."

Another subordinate, Darlene Walker, white, wrote a statement dated November 8, 2023, echoing all of the above:

> Working with Liz (Elizabeth Houston) can be trying, you never know going in if she's in a good mood or not, and the moods can change quickly. I have had several times that she has came at me verbally. I have also witnessed her verbally attacking other team

members in the room along with Marvin. [Greenleaf, Plaintiff's boss, Director of surveillance, who is also black ] She has some very good catches in surveillance and can do a good job but her people skills are awful.

I warned Marvin before he promoted her about her people skills but he said he talked to her about it. The upside of her getting promoted was she would be off of my shift and I would not have to deal with her on a daily basis. When her and Scott worked on day shift because of the fighting between the two, Marvin had to put Scott on 2 days of day shift … because they couldn't get along.

After 7 years of dealing with her I still walk on egg shells when I am around her. We are not in a good position in the surveillance room. We are short staffed and try to get by with what we have but I do think she chases away the ones that we had. Whatever happens its not going to be good.

[Doc. 27] – Exh. 3 at 64.

Of note, none of the complaints (the entirety of which can be found in [Doc. 27] – Exh. 3) mention, comment on or refer to Plaintiff's, or anyone else's, race or make any racially derogatory remarks whatsoever.

**The Opposition**

In her response in opposition to summary judgment, Plaintiff's counsel, like Defendant, recites as the applicable legal standard in this case for demonstrating a *prima facia* case of racial discrimination under Title VII that Plaintiff demonstrate she is: (1) a member of a protected class; (2) qualified for the position; (3) suffered an adverse employment action; and (4) was replaced by someone outside of the protected class, or that others outside of the protected group and similarly situated were treated more favorably. *Okoye*, 245 F.3d at 512-13.[3] [Doc. 35] at 7-8.

---

[3] The 'inquiry into intentional discrimination is essentially the same for individual actions brought under sections 1981 and 1983, and Title VII. Accordingly, where the same facts underlie both claims, the analysis and the evidentiary burdens are functionally identical. *See, e.g., Lauderdale v. Tex. Dep't of Crim. Justice*, 512 F.3d 157, 166 (5th Cir. 2007).

Yet, in the next breath, counsel, in apparent recognition of the fact that regardless of what she alleged in her EEOC charge and the instant complaint, it is now uncontested that she was not replaced (and has never alleged comparator status) to satisfy the fourth *McDonnell Douglas* factor, abruptly pivots to a new theory. She now asserts that she may satisfy the fourth *McDonnell Douglas* factor by offering "some other proof from which an inference that she was terminated because of her race may be drawn" citing in support *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344 (3d Cir. 1999). Plaintiff does not cite a Fifth Circuit decision for this contention and Defendant does not address the issue in its reply.

The court's own review of case law does not reveal a Fifth Circuit decision reviewing a termination for Title VII discrimination case that has adopted this Third Circuit standard. The Fifth Circuit has stated in dicta that the fourth *prima facie* element in a Title VII unlawful discharge case allows a plaintiff "to show that he was replaced by someone outside of the protected class or that he was otherwise discharged because of his race." *Fields v. J.C. Penny Co., Inc.,* 968 F.2d at 535 n. 2. (5th Cir. 1992). The Fifth Circuit has also held in a Title VII unlawful discharge case that evidence that a defendant replaced a plaintiff with someone in the same protected characteristic is "not outcome determinative" and "that the single fact that a plaintiff is replaced by someone within the protected class does not negate the possibility that the discharge was motivated by discriminatory reasons." *Nieto v. L & H Packing Co.,* 108 F.3d 621, 624 (5th Cir.1997); (quoting *Hornsby v. Conoco, Inc.,* 777 F.2d 243, 246–47 (5th Cir.1985)).

It is plain that strict adherence to the well-recognized four factor *McDonnell Douglas* test results in summary judgment for Defendant—inasmuch as there is no replacement by a person of a different race and no comparator status alleged. Nevertheless, the Court, in an abundance of caution, will also analyze whether the Plaintiff has established a prima facia case of termination

9

due to racial discrimination with proof that she was "otherwise discharged because of her race"
*Fields,* 968 F.2d at 535 n. 2.

In the instant case, Plaintiff, with the following multi-stepped argument, contends she can demonstrate such "other proof": First, she argues in her opposition brief that she was terminated based on the complaints of her white subordinates who she contends were motivated to make them against her because she is black. Then, in recognition of the uncontested fact that the decision to terminate her employment was made by Mr. Greenleaf, the black Director of Surveillance, who Plaintiff concedes was not racially motivated in doing so,[4] Plaintiffs' counsel asserts a "cat's paw theory" to establish the necessary link between the alleged racially motivated subordinates' complaints and Mr. Greenleaf's decision to terminate her. *See Staub v. Proctor Hospital*, 562 U.S. 411 n.1 (2011) (explaining background of cat's paw theory). "On a cat's paw theory, retaliatory co-workers manipulate the decisionmaker into taking what appears to the decisionmaker to be a non-retaliatory action." *Hudson v. Lincare, Inc.*, 58 F.4th 222, 232 n.11 (5th Cir. 2023).

In support of this new legal argument, her counsel represents the following to the court: "Ms. Houston testified [at her deposition given November 18, 2025] that Ms. Hill harbored "hate, envy, jealousy and "racial bias" against her, "explicitly referring to Plaintiff as a 'fat, black lady' and complaining that these people think they're so much." [Doc. 35] at 8.

Further, counsel represents: "The evidence demonstrates that Plaintiff's termination was proximately caused by the discriminatory animus of her white subordinates, who resisted her authority through racially stereotyped complaints regarding her tone. ... By relying on these biased reports to justify the termination, Plaintiff's supervisor, Mr. Greenleaf, acted as a conduit for the

---

[4] Greenleaf is, as noted, black and also hired Plaintiff to the night shift supervisor position. [Doc. 35] at 2. Plaintiff does not allege that Greenleaf was racially motivated to terminate her as the decision maker, but, instead, she argues he acted as a "conduit for the subordinates' prejudice" when he relied on the their HR complaints. *Id*. at 9.

subordinates' prejudice, thereby imputing their discriminatory intent to the Defendant." [Doc. 35] at 9.

## The Law

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted). Self-serving statements by a plaintiff that they were performing

adequately are insufficient to create a triable issue of fact. *Salazar v. Lubbock Cnty. Hosp. Dist.,* 982 F.3d 386, 389 (5th Cir. 2020). This court may grant summary judgment when "critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir. 1993).

Absent direct evidence of discrimination, this court applies the burden shifting framework set forth in *McDonnell Douglas*, 411 U.S. at 802–03. *Ibanez v. Texas A&M Univ. Kingsville*, 118 F.4th 677, 682 (5th Cir. 2024). A plaintiff may establish a *prima facia* case of race discrimination under Title VII by offering proof of each of the following four factors: (1) she is a member of a protected class; (2) qualified for the position; (3) suffered an adverse employment action; and (4) was replaced by someone outside of the protected class, or that others outside of the protected group and similarly situated were treated more favorably. *McDonnell Douglas*, 411 U.S. at 802; *see also Okoye*, 245 F.3d at 512-13. The Fifth Circuit has noted that "[t]he prima facie case method established in *McDonnell Douglas* was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Johnson v. Louisiana*, 351 F. 3d 616, 622 (5th Cir. 2003) (citing *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1984)) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978)). "The central focus of the inquiry ... is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex or national origin." *Id.*

Under a "cat's paw" theory of liability a plaintiff alleges that the decisionmaker, the person who took the adverse employment action, did not harbor any racial animus. *Zamora v. City Of Houston*, 798 F.3d 326, 331 (5th Cir. 2015). Rather, a plaintiff must establish under this theory

that a person with a retaliatory motive somehow influenced the decisionmaker to take the retaliatory action. *Id*.

If the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its actions. *Id.* "The burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)). If the defendant carries its burden, then the ultimate burden rests on the plaintiff to prove the employment decision was the result of a discriminatory practice. *McDonnell Douglas*, 411 U.S. at 804.

Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## **Analysis**

As was noted above, I find of significance the fact that neither the sworn charge nor the sworn complaint, made with the assistance of counsel, makes *any* allegation that Plaintiff was ever subjected to any racially derogatory comments or even an arguably race associated comment by *any* employee of the Defendant. Rather, in both her EEOC charge and her complaint, she asserts only that she is relying for her racially motivated termination claim on the fact that one of her subordinate employees, Hill, repeatedly complained to HR about her demeaning treatment; that Hill was white and that Plaintiff was replaced by a white, less qualified employee, Vickie Stephens. The court also finds telling the fact that while in her Complaint, unlike her charge, Plaintiff acknowledged that a number of "extreme and consistently negative allegations" were made against

her by her subordinates and coworkers, nowhere in her complaint is there any suggestion that the multiple complaints of those employees were motivated by racial bias.

Instead, in her complaint as in the EEOC charge, she attempts to demonstrate a racially motivated termination only on the allegation that one of her complaining subordinates, Hill, was white and on the now retracted allegation that she was replaced by a less qualified white female. In fact, as for Hill, in her EEOC Charge and in her complaint, Plaintiff alleges *not* that Hill was motivated by race to complain, but that Hill was motivated to complain about her because she was a "disgruntled employee" "who simply did not like to follow directions" [Doc. 1] at 2-3. Similarly, in her complaint, she states the multiple other employees who made written complaints about her were motivated, not by race, but by their "frustrations with Plaintiff's expectations that her subordinates meet their goals and perform their job duties at a high level of proficiency,[and she] "frequently had to manage the protest of disgruntled employees.", [as it] "it is common that those employees project their frustrations on to their supervisor rather than owning up to their own job performance deficiencies." *Id*. at 4-5.

Rather than being able to point to any fact actually alleged in her complaint or EEOC charge, Plaintiff in her brief in opposition to summary judgment relies for "proof" that she was terminated due to her race, only on certain purported testimony Plaintiff gave at her deposition taken November 18, 2025, and on what her counsel describes as multiple written complaints made about her by her racially motivated white co-workers. *See* [Doc. 35] at 11. Each of these contentions is further addressed below.

As earlier noted, counsel represents in her opposition brief that: "[Plaintiff] testified that subordinate employee Scarlett Hill made racially derogatory remarks in the work place. Ms. Hill, 'explicitly refer[ed] to Plaintiff as a 'fat, black lady'" However, a review of the transcript reveals

there is simply no allegation that Hill called Plaintiff a "fat, black lady"—much less, as counsel has represented—"explicitly" so. Instead, what she alleged—albeit for the first time at her deposition, almost 2 years after her termination, was the following:

> 16 Scarlett Hill, who started as a completely new agent.
> 17 A. Yes, sir. And I did. I provided her with
> 18 training of -- of the room operations, yes.
> 19 Q. Well, so tell me about that. How did that go?
> 20 A. It -- eventually it went well. It started off
> 21 well and all of a sudden her -- her aspirations turned
> 22 into hate, envy, jealousy.
> 23 Q. Hate, envy and jealousy of whom?
> 24 A. Of myself.
> 25 Q. And what makes you say that?
> A. From her actions.
> 2 Q. Describe what you're saying when you say her
> 3 actions showed that she had envy, hate and jealousy for
> 4 you.
> 5 A. As well as racial bias.
> 6 Q. Give an example.
> 7 A. She immediately started saying things like, I had
> 8 A. -- she worked with a black cocktail waitress that
> 9 thought she was so much, and she went to HR and got her
> 10 fired. And -- and I kind of, you know, shrinked
> 11 (phonetic) a little bit, and she would say all kinds of
> 12 racial -- racial things as far as not -- sometimes not
> 13 directly at me but towards me.
> 14 These people think they're so much around here.
> 15 These -- look at this fat, black lady over here doing
> 16 this, or, this fat, black lady over here doing that"

[Doc. 34] – Exh. 1 at 38-39.

Since, the representation that Plaintiff testified that Hill "explicitly refer[ed] to her as a 'fat black, lady'" is through oversight or otherwise, demonstratively inaccurate, that leaves as the totality of the "evidence" offered to support the assertion that Hill—because of Plaintiff's race—influenced the Director to terminate her, only the following: Plaintiff's vague allegation during her deposition that Hill said to her, in reference to some unidentified person or persons, at an unidentified time, "these people think they are so good"; that Hill said at some unidentified time

with reference to someone not named "look at this fat, black, lady over here doing this, or, this fat black lady over here doing that"; and Hill's alleged statement that at some unspecified time she had worked somewhere with a black cocktail waitress who "thought she was so much", and Hill allegedly "got her fired." On their face, these allegations, even assuming admissibility, do not, particularly in the context of the circumstances of this case, evince a racial bias. The reference to "these people think they are so good" would not appear to be a reference to any one race. And while describing anyone with the potentially un-flattering descriptor "fat" is rude, it is rude (generally speaking) to persons of all races. Nor is the mere reference to a person's color as a descriptor, of itself, racially derogatory.

Moreover, I note the fact that even though Plaintiff was Hill's superior, she never wrote her up or filed any written complaint of any nature against her, discriminatory or otherwise. [Doc. 34] – Exh. 1 at 38-39, and as demonstrated above, neither the EEOC charge, nor the instant complaint contains any allegation against Hill (or any other employee) evincing a racial bias.

As for the proof alleged to support the contention that the numerous other employees who complained about Plaintiff did so due to her race, Plaintiff's counsel cites only page 29 of Plaintiff's deposition, which she represented to be: "evidence demonstrate[ing] that Plaintiff's termination was proximately caused by the discriminatory animus of her white subordinates, who resisted her authority through racially stereotyped complaints regarding her tone" [Doc. 35] at 8. However, page 29 of the deposition states that Plaintiff was told that one employee complained to HR that she was "condescending to her" and that other employees complained about her as well, indicating that they did not want to work with her. There is no mention of race in the cited deposition testimony, and a review of the referenced complaints reveals nothing about race. but instead, only that her coworkers, black and white, complained that Plaintiff's behavior toward

them was described as "bullying", "scary", "rude", "demeaning ", "harsh", "hostile", "moody", "unpredictable", "disrespectful", and "belittling". [Doc. 27] – Exh. 3 at 60-69. *See also* excerpts, *supra*. p. 5-8.

Also concerning to the Court, is the fact that Plaintiff's counsel never acknowledges that the multiple employees who complained about Plaintiff's behavior and treatment of them, were, in fact, *both* black and white. Moreover, the suggestion that these various complaints include racially derogatory comments—or concern race at all—is simply not borne out by a review of the complaints made. Finally, far from evidencing pretext for discrimination, as Plaintiff's counsel suggests in an entirely conclusory fashion [Doc. 35] at 9-12, these complaints demonstrate just the opposite—they demonstrate that Plaintiff's coworkers, black and white, uniformly disliked her because of her treatment of them.

In short, it appears to the Court that there is *no* rational support for the assertion that Plaintiff's termination was due to her race. Indeed, the only statement even alleged to have been made to Plaintiff concerning her race—that she was "explicitly called a fat, black lady," is demonstrably inaccurate. Such inaccuracies, and the eleventh-hour assertion of an alternate legal theory and facts to advance a claim of racial discriminatory termination, supported in the sworn pleadings only with the now discarded (and inaccurate) representation that Plaintiff was replaced by a less qualified person of another race, evidence a case without merit. There is simply no genuine issue of a material fact for a jury to determine in this case.

For the reasons stated above, Defendant Majestic Mississippi, LLC's Motion for Summary Judgment, [Doc. 25], is **GRANTED.** Ms. Houston's claims against Majestic Mississippi, LLC are **DISMISSED WITH PREJUDICE**.

A separate judgment in accordance with this order will be entered on this date.

**SO ORDERED** on this the 5th day of March, 2026.

/s/ Jane M. Virden
**UNITED STATES MAGISTRATE JUDGE**